For the appellant, Mr. Manchin, for the affilee, Mr. Hayes, you may proceed. Please the court, counsel. Good afternoon, your honors. This case involves a state of appeal from a order suppressing evidence, and the standard to review in this case is de novo, since the facts below were simple and undisputed. The facts were that prior to Jardines, police officers received a tip and took a sniffer dog to an apartment building. The dog alerted to the door of the defendant's apartment, and they got a warrant, and after using the warrant, they found drugs in the defendant's house. Why did they need a sniff of the dog? They had information that somebody told the police that the defendant was getting contraband shipped to her from her brother in California. They had that information. Why not use that to get a search warrant? Well, the timing indicates that they could have gotten one, but at the time of the search, there was no law that said you can't use a dog to do this type of behavior. Most of the law in effect at that time said the use of a sniffer dog... Well, that's not accurate, counsel. This court's true T-R-U-L-L case talked about entering an apartment that was locked, and that's what happened. There's also case law at that time that says that even entry of an apartment building did not violate the Fourth Amendment. Not with a dog. Well, a trial did not involve a dog either. So there was conflicting authority, and none of the conflicting authority involved the use of a drug-sniffing dog. Correct. So are you abandoning the notion that... I'm not abandoning the notion that the officers were acting in good faith. No, I don't mean that. I mean, are you... I'm saying that there is no... locked or unlocked. There's no expectation of privacy? There's no expectation of privacy to common areas of an apartment building. Is it clear? That's what... So people that live in apartment buildings, within a locked apartment, not in a locked apartment building necessarily, within a locked apartment, they do not have the same protection that the household, the homeowner, if it was a home. How do you know that Jardine's was a single-family home? The facts of the case, as I recall it, does say so. It was a single residence. It was not a... I'm not sure that's what the case actually... if that's actually clear, but assuming that that's clear, why are we treating that person different than the person... Well, we already treat people in apartments different than people in houses as far as the expectation of privacy.  That is exactly what Jardine's was based upon, though, was the expectation of the privacy of the individual that was violating... The majority opinion? In the... Or the special concurrence. The special concurrence... That was the expectation of privacy. Privacy was. That was done by the special concurrence, and didn't Justice Scalia say that wasn't necessary for the majority? Well, he did write for the majority. It was the... Again, the majority relied upon curtilage, and the curtilage analysis has never been applied to common areas of apartment buildings. Why not? Why doesn't it? I think the curtilage is based in part on the expectation of privacy of the individual that the person... So you don't believe apartment dwellers have the same right of privacy as homeowners? I'm saying as to the common areas of apartment, which is where this search occurred. The threshold of my apartment, I expect that the people that arrived there have crossed the common area and have entered the curtilage. But your curtilage is six inches. But that's as much mine, for purposes of entry to my apartment, as a stoop would be. I mean, Jardine's is a porch. I guess we're saying, you know, if we add to the facts of the case, maybe it's an expansive front porch, you know, with the wooden stairs and railings and whatever, and Victorian bric-a-brac. But my house is a single-family home, and it's got a concrete stoop this wide. Is that my curtilage? And if it is, then why isn't that space in front of my apartment door the curtilage? Or why isn't the curtilage the common area? Because it's only a common area that people have the right to be there. And the police officers got inside when it was locked. And the evidence doesn't show how they got in. Yes, it does. It says that another policeman allowed somebody. But how that first police officer got in was never assessed. It's important, isn't it, if we're talking about whether or not there's an expectation of privacy. Now we're talking about, if you live in a house, you have this expectation of privacy. If you live in an apartment building, you have a greater expectation of privacy if the outer doors are locked, I guess. But you have almost no expectation of privacy if you live in one of those student apartment buildings where they prop the doors open and have absolutely no security. Because you know that dozens of people are going to walk through there without any right to be there. Would that be our standard? Under the law that exists with regarding to searches of common areas in police in apartment buildings, yes. And the majority of courts that have faced this question of does Jardines apply to apartment buildings have reached the conclusion that no, Jardines doesn't, because the analysis used by the Supreme Court just does not fit with the common area of an apartment building because of the fact that that is an area where the individual apartment owners have no control over who's there because the other apartment owners have the right to allow access. And so that there is the, it's clear that there is no expectation of privacy so that, and no curvilage involved in the common areas so that the whole analysis of Jardines applying the search of a dog to a individual home just simply does not apply in a, the context of an apartment building. I suggest that even if Jardines, if this court was to rule that yes, Jardines should apply to apartment buildings, that suppression is still not required under the good faith exception because at the time that this search was conducted, Jardines had not been decided. It was still in the works. And the case law at that time was clear that the use of a dog was a non-event, was not in the search of any kind because people had no expectation of privacy as to smell and because a dog could only detect contraband, it could not detect legal activity. And in fact, in one case, the court held that applying the dog search, this was, it was cited in my reply brief, it was people, it was Gunther out of the 2nd District in 1992, using the dog searches of cars and luggage said that no, bringing a dog into a house does not, was not a search because of the, because of the fact that it only disclosed contraband and there was no, in Gunther there was no question that the police had a right to be there. If the Supreme Court wanted to go that route, they could have done so in Jardines, right? They could have said, we've already said in Cabalas and other cases that a dog sniff is not a search because a dog sniff only detects the presence of an illegal substance, not legal activity. They didn't do that. Which makes Jardines kind of a question, which begs the question, why did they reach the decision they did in the case? Because in Cabalas, just a little, just shortly before this, they had expressed or rejected the analysis that a dog was some kind of a instrument that the police could not use for a search. I think what they're getting at when they skip to the curtilage is that you take a dog into the curtilage, it's the same thing as taking the dog into somebody's house. That's why they talk about the curtilage. The curtilage is part of the home. And so once you take the sniffer into the curtilage, you've done this exact same thing as taking the sniffer dog into somebody's house and they just will not allow that under the Fourth Amendment. Is that a fair reading? I think that is a fair reading of Jardines. There's a bug coming here. What's the bug? But I think it does, based on an analysis of why they're holding this, because of the curtilage and the expectation of privacy, that simply does not apply in the context of a common area of an apartment building. Plus, what I'm suggesting at this time is that given the state of the law at the time of this search, the police officers were acting in good faith that the use of the dog was perfectly legal. Except for the troll case. Yeah, which there was also a number of cases. Which is binding in this district still, as far as I know. If it is still followed, and it shouldn't be followed because it's based upon, the decision was based in that case was based upon federal cases which have since been reversed and overturned. So the analysis there should no longer be followed. So I think that the police officers, there was competing case law regarding whether or not you can go into an apartment building, locked or unlocked, including one case which has refused to follow a troll. It's cited in my brief. I believe it was, well, I can't recall it off my head. Suppose this court agreed that the police officer did act in good faith. Where do we go from there then? The good faith exception to the exclusionary rule that said that even if this is found to be bad under Jardines, the good faith exception would apply to allow the use of the dog and to uphold the validity of the search. Because you cannot deter the police officers because they were acting in good faith on what was the law in effect at the time. So that under the good faith exception, the exclusionary rule should not be applied. Then we get to the final question. Assuming you don't apply good faith, we get to your original question, or Justice Appleton's original question. Why did they bother with the dog? Because they had sufficient probable cause without the dog to justify the warrants. Because they have a Crime Stopper tip that this person is dealing drugs. The tip shows that the reporter has personal knowledge of the drugs. They report details that the defendant receives marijuana in the mail every two weeks from California. The reporter says that the defendant has some interesting information on her Facebook. And then the police go out and they investigate. They find out that yes, this individual does live at this address. They find that this individual has a history of drug arrests. They find that this person does have a website that has information on it about advocating the legalization of cannabis. Has photographs of cannabis. Has photographs of a large pile of money. They go into the apartment building and the warrant says that they were let in by another apartment dweller at this time. And they see sitting at the defendant's door a package with a return address of California. The package was at the defendant's door? I believe it was at the defendant's door. Let's see if we can find that. Well, if you're sure. Yeah. I didn't glean that from the briefs. I thought the indication was the package was seen, but I wasn't clear where it was seen in the apartment complex. Which I think is pretty critical, though. I'm trying to see if I can. I'm looking at the. Well, I don't want to interrupt you. I'll tell you to look it up when you wait for your rebuttal. Okay. But the complaint for the warrant says that he personally walked through the building and observed a package addressed to Taryn Burns at 409 West Elm number 10. The package observed had a return shipping label listed. That's what I read, but that doesn't tell me where the package was seen. Yeah. But it is. Okay, let me ask you this. If the police officers had probable cause, why did they take the dog in there? Because that suggests to me that they knew about the criminal activity. They knew that there was a package, but they hadn't tied up the return address to the defendant's brother. And they weren't quite sure they were going to be able to convince the judge. How do I know that package is within this apartment? Because they needed to tie that together. And they almost had it, but they didn't quite. So they took the dog. I think they took the dog in out of the excess of caution. I think they had plenty of probable cause. My speculation is unreasonable that maybe they had all this other stuff, but not enough to convince a judge that the package is actually inside the apartment. I think they were doing what police officers often do. They have all the evidence they need for a warrant, but they just want to make sure that there's all the I's dotted and the T's are crossed so that they don't have some defense lawyer say, hey, why didn't they? If the police officers were acting in good faith, why didn't they have the dog go down to the first floor and sniff three additional apartment doors? It could have been done as a control to make sure that it was, in fact, reacting just to drugs at that location and not from someplace else. The officer didn't explain why he went down the hallway. All he testified is he went down that hallway. He didn't just go down the hallway. He went down to a different floor. Yeah. And the officer didn't, there wasn't anything, there isn't anything in the record to explain why they had the dog, I forgot what the terminology is, but check out three additional apartments. No, the record does not explain that. Yeah. All right. But I think that under the de novo standard review, this trial court's decision should be reversed. Thank you, Your Honor. Mr. Hayes. Your Honor. I suppose I should start the traditional way. May it please the court. I've been doing this for 40 years. I'm reminded, Justice Connacht, of my first trip to Springfield before the Fourth District. Judge Craven was sitting where you were. He interrupted me immediately in the case that we were arguing and to tell me a story about the young lawyer who, listening to the judge discussing the case with his opponent, the judge looked out and said, Young man, before you say a word, I want you to know that we understand your argument. The young lawyer said, Well, Judge, I want to thank you for making my argument, but please don't lose the case for me. Now, I've kept that in mind for 40 years, and if you will permit me just a moment of personal note, this will likely be my last trip before the Fourth District. And it's been a privilege to discuss the law over those years, a privilege that I have not earned. In that 40 years in the vineyard, I've produced some grapes with a sweet taste, and many that were bitter. But it has a privilege that I thank you, as representatives of all of the ladies and gentlemen  for permitting me that privilege. It's one that I shall treasure for an eternity. I can't believe the tenor of the argument that says that a citizen's right under the Fourth Amendment is defined by the number of sticks he has taken from Dean Kribitz's bundle. Property law, if we want to discuss the nuances of it, includes the right of the tenant. And the tenant takes his rights from the bundle of the property owner. And it's been so with respect to a person's residence since the 12th century. No lord can come into his serf's home under the law which we inherited from the mother country. That's what we're talking about. The idea that one does not have the rights enunciated by Justice Mills in full in a secured building just is anathema to our ideas of the man's home being his castle that Judge Scalia focused on. Now Justice Mills decided that case based upon the reasonable expectation of privacy. When you lock a door against all of the world, you have a right to expect the privacy. But that wasn't necessary. What did the tenant get when he rented that apartment? He got the common areas under the circumstances that they were excluded from the general public. It is a property right. Whether we're dealing with a trespass or a reasonable expectation of privacy, we're talking about the obverse and the reverse of the same coin. And the cases are clear. The state believes that trawl is not good law. Although it has never been overturned, it has never been appealed, it stands as good law. He talks about two cases. One of them is Lyles. Out of the northern part of the state. In those cases the court did not say that the locked area was open to anybody. It didn't say that. What they did was they distinguished the facts of their particular case. In the one, somebody escaping and then followed back up to his apartment through a secured common area. They distinguished it and decided trawl did not apply. Mr. Justice Mills found in trawl, you will recall that that didn't involve a dog, it didn't involve drugs, it didn't involve anything more than the use of a key found in the defendant's pocket to open the common area and then check for the, and Justice Mills found that was a search. When they checked to see if the lock would operate, this key would operate the locks and enter to trial in the apartment. Now, Mr. Justice Scalia made a point, and a significant one, that a police officer may be anywhere that a private citizen may go. That a person has an implicit license to knock, ask admittance, wait, if not answered, then leave. And the police officer has that same right. Now, what right did the police officer have at 3 a.m. in the morning on the 12th of January of 2013? The same right that you or I would have walking down Elm Street in Urbana. We could go up and we could try that outer door, and if it was locked, we could leave. We could ask admission if there were a bell, and if it was not answered, we could leave. That's the same privilege, license, in Judge Scalia's language, that the police officer had. Nothing more and nothing less than you and I would have. Now, counsel tends to talk about this package as though it were something important, and it is. And this is why it is. What they were dealing with, and the reason they didn't have probable cause, and they had to hunt for probable cause, was they had an anonymous, unsubstantiated tip. Detailed, perhaps. We don't know. We haven't heard the recording of the 911 call, but we have heard the officer's description through his affidavit. That a package would come every two weeks to Taryn Burns from her brother who lived in California. Now, I think it is significant, and very significant, that nobody had the dog sniff the package. Nobody checked with the post office. Well, was the dog present when the package was first observed? The package was first observed at 10 o'clock in the morning following the 3 a.m. dog sniff. It was observed, according to the affidavit, at the area near the post boxes on the stairway. Not in the apartment. Not near the apartment. Wait a minute. You're saying that the package was first observed by law enforcement subsequent to the dog sniff? Yes, sir. Seven hours subsequent. That's when Officer Meacham, who was not involved in the 3 a.m. search, testified, I believe, that he had gone in to check. And before they had asked for a search warrant, to go in and check to make sure that he understood where the apartment was. And that's when he saw the package. So, at the time of the dog sniff, as far as what the state would have had as a problem to cause, they would have had the background, they would have had the tip, the package was sent from a brother from California to this particular district. Is that it? Yes, that's it. That's what they had. Now, when they find the package, the dog has already been there. He's departed. It wants to go in and check and make sure he knows when he's going to execute a search warrant that he hasn't asked for yet. That he knows where that is. That's when he sees the package. It's a package addressed to Taryn Byrne and has a California return address. That's it. So what was done with the package? I don't know. I don't know what was done with the package between the time the postman delivered it. Was there really an affidavit for search warrant that the package was found by, I guess, the mail room, not in front of the defendant's door? And that it was found subsequent? It was found subsequent to the dog sniff at 3 a.m. Then it was apparently delivered, because there's no mention of it prior to Officer Meacham's appearance in the building at 10 a.m. and the time when the search warrant was secured and executed in the afternoon. There is nothing in the record or in the materials that I have seen that accounts for that package. We don't know that it ever got to her apartment. Last it's seen is sitting on the stairway near the mailboxes. You know, there's this panel of mailboxes. You know, how does that give us probable cause? Nothing more than there's a package with a California return address. Now, the fact that the tip included the information that she had a website, that she advocated the legalization of marijuana, and that there was a photograph of U.S. currency on that website, what does that add to the information that was available to them prior to the dog sniff search? Now, I want to get rid of one misconception. The sniff by a dog of a residence is a search under the Fourth Amendment and requires authorization by a warrant. Now, that's what Jardines stands for. That's the law. Even the Seventh Circuit recently acknowledged that a dog sniff search of a residence requires the prior authorization. Now, Gutierrez applied the good faith exception based upon the existence of Seventh Circuit binding opinions that said a dog sniff wasn't a search. Except that, that might apply here, except that we have trauma. The officers were bound to know, because like it or not, we believe that they are bound to know the law. Does it matter that a resident of the apartment complex allowed the officer, the first officer, to enter into the apartment? Excuse me, I did not hear your question. Does it matter that the officer who arrived at the apartment complex first was actually admitted by a resident of the apartment complex? I don't believe it does. Well, that would be consent to entry, wouldn't it? That certainly is not the fact here. We don't know how the officer who entered the building first, and it wasn't Officer Cervantes with the dog, because Officer Cervantes testifies that he was let in by the other officer, not Officer Meacham. I'm sorry, as I stand here I've forgotten the name. If the first officer entered with the appropriate consent, in your opinion, would that have allowed the first officer to then let a second officer in with the canine unit? No, I would not think so. It would seem to me that if I'm living in a secure apartment building, and the tenant in apartment 1 and I'm in apartment 8, if the tenant in apartment 1 lets somebody in the building, he's giving that person license to visit apartment 1. He doesn't have any other authority, because his authority would conflict with mine. He doesn't have the right to admit somebody for the general purpose of searching the place at 3 a.m. That's something that Judge Clem focused on, the time, the circumstances of this. I think that this is an intriguing problem, one that we have grappled with, and one that I know you will grapple with. And I trust that you will reach the right decision.  Mr. Powell. If the court counsel, getting to your question about allowing one police officer to enter, I think if that was established, there would be no problem with the officer opening the door or holding the door open for another individual. Just as if an inhabitant of the apartment was walking out the building as the police arrived and the police just caught the door and walked in. Because there is simply no, the authority of the apartment owners is greater than defense counsel suggests. It's not limited to allowing them to come in to see apartment 1. You see it all the time where she says, hey, can you hold the door for me, I want to see so and so in apartment 5. So that the authority granted by somebody else letting them in would be broad enough to allow the officer to let the other police with the dog to come in. As far as the probable cause and what the heck the reference to the Facebook is, all this reference to Facebook was was to the police officers' actions in corroborating virtually every detail of the informant's tip. Which gets us back to why didn't they just get a warrant? Which is a good question, but again, police officers are not required to act at the first moment that they get probable cause. They are allowed to continue investigating. And then according to what you've been saying, they went about corroborating all the details of the tip. So why didn't they just get a warrant after they've done that? Well, they were using the dog to further corroborate the tip by saying, oh yeah, we know that there is drugs here because we took a dog by and he's allergic to the dog. That's the final nail in the coffin as far as corroborating the tip. Police officers are not required to stop their investigation or to seek a warrant at the first instance that they get probable cause. It wasn't the first instance. They went through Facebook pages and all this other stuff to corroborate the informant's tip. At that point, why don't you just get a warrant? And the record doesn't show why. I think why is because at that time, use of a dog in this fashion was not considered a search. And it was considered to be a legal activity. And the police officer were just, like I said, trying to get the final eye dotted or the final bit of corroboration for the tip. Mr. Manchin, I realize you're just zealously representing your client, so bear with me on my questions. But it seems to me that the state's position is that these officers could have taken that dog to every door in the entire apartment complex. I think there were ten different apartments. And if the dog had hit on all ten doors, they could have got a warrant for all ten doors. Would that be something, as you have presented the state's case, something that could have occurred? It is something that could have occurred under the law and effect of the time of the search. The use of a dog was not considered to be a search in any shape, form, or fashion. Because of the nature of the dog and the nature of what it discovered. And the case law was clear that if the police officer had just, take the situation where the police officer happens to be the canine guy. He's there to serve a warrant on somebody else. And his canine, his dog, alerts to a different apartment while he's in there. That would establish probable cause. The officer has a right to be there. I'm just saying though that the facts of this case and with the limited nature of the search. They were not doing a sweep of every single apartment in the building. They were doing a sweep of this apartment because they had probable cause to believe that there was drugs in there. And they wanted to just confirm that. So I submit that either because Jardine's doesn't apply to apartments. Or because the police officers were acting with good faith on the law at the time. Or because as your justices have pointed out, they had probable cause before they had the dog. So if you cut out the reference to the dog in the warrant. Is there sufficient evidence to justify the warrant? The question to that is yes. So the trial court's suppression order should be reversed. Thank you. Thank you, your honor.